Filed 12/18/20  In re K.C. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re K.C. et al., Persons Coming Under the Juvenile Court Law. | B302935 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 19LJJP00279A) |
| Plaintiff and Respondent, | |
| v. | |
| KIMBERLY C., | |
| Defendant and Appellant. | |

APPEAL from findings and orders of the Superior Court of Los Angeles County.  Steven E. Ipson, Judge.  Dismissed in part and affirmed in part.

Nancy R. Brucker, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

———————————————————

Mother Kimberly C. appeals the juvenile court's jurisdictional findings and disposition order removing her four children from her custody (K.C. [born 2002]; J.C. [born 2007]; N.C. [born 2009]; and J.M. [born 2011]) and ordering her to participate in services. The orders were based upon an allegation mother placed the children at substantial risk of serious physical harm because she had "unaddressed mental health issues" and "exhibited erratic behaviors to include paranoia, hallucinations, and speaking to people who don't exist." (Welf. & Inst. Code, § 300, subd. (b)(1); all statutory citations refer to the Welfare and Institutions Code.)

We dismiss the appeal of the orders involving the oldest child K.C. as moot because the juvenile court terminated jurisdiction over her after she turned 18 years old. We affirm the orders involving the three younger children.

## BACKGROUND

The family has a history of child welfare referrals going back to 2008. Three reports of physical and emotional abuse were all closed as unfounded, but a 2009 report of general neglect was substantiated. It was reported mother and another adult were smoking marijuana in a car while one-year-old J.C. was present. The reporting party also found a bag of marijuana in the home and reported the home was dirty with rotten food on the floor of the bedrooms. The referral was closed with the understanding mother would participate in a substance abuse program.

The family most recently came to the attention of authorities on March 20, 2019 when someone reported mother left a "[s]trange voicemail" during which she was "frantically screaming and crying and said that she cannot leave her

2

apartment because people are harassing her" and "hitting her" with rocks and other objects when she tried to leave. Mother also reported one of her children was "abducted" and said, "they took my child, help me, help me." When the reporting party contacted mother, she retracted her statement that one of her children was missing, but claimed, "Everyone is sick because of the mold. There are cameras in the house and she can't leave because they are watching." When asked if she needed an ambulance, mother said, "They already know, they are watching through the cameras in her home."

A deputy conducted a welfare check on the family, but mother refused to be interviewed or allow the deputy into the home. While mother was evaluated and did not meet the criteria for a section 5150 hold,[1] she appeared to be "paranoid." She was afraid to leave the apartment and felt like the neighbors were out to get her. The children appeared clean and well-nourished. One of them said the neighbors were harassing them, but the deputy could not determine whether that was based on mother's comments or if it was really occurring.

A week after the deputy's visit, a social worker went to mother's home on three consecutive days. On the first visit, mother was belligerent, swearing and refusing to let the social worker into the home or speak to the children. Mother threatened, "Get the fuck off my stairs now before I do something to you!" On the second visit, mother again refused to allow the

---

[1]     Section 5150 permits authorities to detain a person for 72 hours in custody if there is probable cause to believe he or she is a danger to him or herself or others due to a mental disorder.

social worker in and claimed it was the wrong house. On the third visit, no one answered the door.

Mother's property manager was interviewed. She described mother as "difficult." Mother would call for repairs but would not let anyone into her apartment and would report to the city that the repairs were not done. Mother was being evicted for not paying rent, and she was rude and belligerent toward building staff. She shouted out her window, "Fuck everyone, fuck management, fuck the staff and I'll make sure everyone gets moved out of here before they move me."

The property manager believed the children were not enrolled in school and were not being home schooled, despite mother's claim that they were home schooled. The manager would see known drug dealers and users frequent mother's home, and she believed mother had mental health issues and was a drug user herself. In January 2019, mother flooded the apartment, and when the manager entered, she found the apartment dirty and without furniture or beds. Mother had also thrown furniture out of the apartment and vandalized the apartment twice. Mother also claimed someone broke in through the roof. The manager thought the children seemed traumatized and were trained not to speak to anyone without mother's permission. The manager noticed mother would leave for days with her oldest daughter K.C. in charge of the three younger boys.

Like the property manager, a neighbor reported she thought mother was mentally ill, constantly screaming and throwing things like used condoms and food out her window. The neighbor also noticed mother would leave the children with K.C. for long periods and drug users and dealers would frequent

4

mother's apartment. She heard yelling and things being thrown when men were at the apartment. She, too, did not believe mother was home schooling the children, due to mother's possible mental health issues.

Mother moved out of her apartment in April 2019, leaving a note saying, "God Bless all you evil People. Pooh Bear Peace Out." The apartment was completely destroyed. The property manager later reported seeing mother, who seemed nervous. The children appeared well-groomed and well-fed. The manager suspected mother and the children could have been homeless at the time.

Mother's section 8 caseworker was interviewed, and she discussed a visit from mother on March 21, 2019, the day after the welfare check at mother's apartment. Mother was irate, and the three younger children were crying and sad. They seemed accustomed to mother's "bizarre behavior." Mother e-mailed the caseworker the next day to apologize for her behavior and to thank the caseworker for the help.

The juvenile court detained the children at-large in April 2019 because their whereabouts at that time were unknown. In May 2019, mother and the three younger children were located in a motel in Lancaster. Law enforcement assisted the Department of Children and Family Services (DCFS) in detaining the three children because mother would not cooperate. The oldest daughter K.C. was located a week later, but she left her placement on the same day.

The three younger children were interviewed. They all appeared healthy and appropriately dressed. None of them reported any problems with mother, and they felt safe, well-fed, and cared for. They denied mother ever left them alone or that

people would come in and out of the home.  J.M. did report he asked for food once from mother's friend because "[w]e didn't have any and my mom didn't have money."  He also said mother asked this friend for food once before.  J.C. and N.C. denied J.M. ever begged for food.

The children reported the family slept in a tent in a park for several nights after leaving their apartment before moving into the motel room.  J.C. said they moved out of their apartment because the landlord wouldn't fix anything and there was "mold on the walls and broken drawers."  N.C. said the apartment manager "forced us out."  J.C. said he and his siblings were "not okay" sleeping in the park and didn't feel safe.

Although K.C. had run away from her placement, she was interviewed while briefly in DCFS custody.  She reported mother suffered from mental health issues and was bipolar, seeing and hearing things and people that didn't exist.  When the family was living in the motel room, mother frequently kicked K.C. out due to mother's mental health issues.  K.C. believed mother was currently attending therapy, but not on medication for her mental health.  K.C. was "stressed out" because she was expected to care for her three younger brothers and mother often kicked her out of the home due to mother's mental health condition.

During an interview, mother was very defensive and did not understand why the children had been detained.  She denied drug users or dealers were coming into the home and denied she left the children alone or failed to provide them adequate food.  She denied living in the apartment when the social worker was investigating the family.  She claimed her apartment was uninhabitable and the landlord would not make repairs.  She said she had documentation to prove the allegations against her were

6

false, but she never provided it to the social worker. She denied having contact with N.C.'s or J.M.'s fathers "in years," which the social worker believed was false. Mother refused to provide her social history or answer any questions regarding the children's medical, dental, educational, or developmental history.

The social worker reported "it was very difficult to complete an interview with [mother] as she displayed paranoid behaviors throughout the interviewing process" and appeared dishonest. The three younger children seemed protective of mother. The dependency investigator observed an appropriate visit between mother and J.M.

Alexander C., J.M.'s father, reported mother was an "excellent parent" until she moved to Lancaster. He noticed "little things" like doors being taken off hinges, and when he asked her about it, she would tell him to mind his own business. He later learned mother and the three younger children were living in a tent in a park. When they moved into the motel room, mother was secretive and would not tell him the room number. J.M. told him the room number, and when he went to pick J.M. up, mother was aggressive, yelling and telling the children to shut the door. When he later told mother he would enroll J.M. in school, mother became upset, yelled about "messing up her money," and tricked him into returning J.M. He also reported mother spoke to him in court, and she was "talking all weird saying that everybody in the apartment building got light [*sic*] turned on in my name and that they have the house wired and tapped." K.C. told him mother kept kicking her out of the motel room and "something is wrong with her mother and that she is crazy."

Between June 28, 2019 and August 29, 2019, the dependency investigator was unable to connect with mother outside of court to provide services, despite extensive efforts. Mother did not contact or have any visits with the children during this time. When the social worker made contact on September 12, 2019, mother indicated she was completing intake for counseling, parenting, and anger management, but did not provide any further information. She had missed a drug test. She was having regular visits with the children, which were positive.

The social worker again experienced trouble contacting mother in November 2019 in order to set up a team meeting. When the meeting was finally held, mother reported she had set goals, enrolled in a parenting class, had received a mental health assessment, and had another mental health appointment scheduled. But four days later, mother sent the social worker a text message from a new phone number, claiming "someone placed a notice at my door that is very scary and I was fear [*sic*] for my life so I had to change my number." She asked the social worker, "Please pray for me I will not be at my home for a while because I'm scared that someone will come kill me." She said, "I'm not crazy," and asked, "Please work with me please I have no reason to fabricate this. I can email you the letter that was placed on my door to show you that I'm not crazy." The social worker asked for her to send the letter, but mother never responded or sent it.

In a December 2019 last minute information for the court, it was reported that J.C. recently said he did not like mother or want to return to her. He said she socked him in the jaw and hit him with a pole on his head and arm because he was

8

"disrespecting her boyfriend." On one occasion, she hit him in the legs because he was walking too slowly. He said she was bipolar. When asked how he knew that, he said, "Because she told us that she is bipolar." The abuse allegation was investigated and found inconclusive.

In this last minute information, the social worker also reported she tried to contact mother again unsuccessfully and noted mother's "mental health makes it very difficult to service her case. It is imperative that [mother] begin mental health services and remain consistent with treatment."

The court held the jurisdiction/disposition hearing on December 4, 2019. K.C. was still AWOL, so she was not represented at the hearing. The court sustained the allegation mother suffered from mental health issues that exposed the children to a substantial risk of harm.[2] For disposition, the court

---

[2] The juvenile court sustained mother's section 355 hearsay objections to statements by the reporting party, mother's property manager, her neighbor, and her section 8 case manager to the "extent that the evidence still comes in, but it would not be the sole basis for jurisdiction if the court takes jurisdiction." (See § 355, subd. (c)(1) ["If a party to the jurisdictional hearing raises a timely objection to the admission of specific hearsay evidence contained in a social study, the specific hearsay evidence shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based, unless the petitioner establishes one or more" enumerated exceptions.].)

Based on these sustained section 355 objections, the court dismissed two counts under section 300, subdivision (b)—a count alleging mother endangered the children by allowing drug users and dealers into the home while the children were present; and a count mother neglected the children by leaving them home alone without adequate food. The court also dismissed a count based

9

ordered the children removed from mother's custody. For the case plan, it ordered mother to complete five random drug tests and then submit to testing on suspicion of use. It also ordered her to complete parenting classes; mental health counseling, including a psychological assessment; and individual counseling with a licensed therapist with mother to adhere to the recommendations of the treating doctor. The court granted her monitored visitation. The protective custody warrant for K.C. remained in effect.

Mother appealed on December 9, 2019. In an order dated October 8, 2020, the court indicated K.C. had turned 18 years old. The court recalled the custody warrant and terminated jurisdiction over her because she "has reached majority or has been emancipated."

## DISCUSSION

### *Mother's Appeal of Orders Involving Oldest Child K.C. Is Moot*

As noted, on October 8, 2020, the juvenile court terminated jurisdiction over K.C. because she had turned 18 years old. We requested briefing on whether to take judicial notice of this post-appeal order and whether it renders mother's appeal of the jurisdiction and disposition orders involving K.C. moot. DCFS contends the appeal as to K.C. is, in fact, moot and should be dismissed. Mother opposes dismissal.

We take judicial notice of the order. (Evid. Code, §§ 452, subd. (d), 459, subd. (a); *In re C.C.* (2009) 172 Cal.App.4th 1481, 1487, fn. 3.) The termination of dependency jurisdiction generally renders an appeal of previous orders moot. (*In re C.C.,*

on Alexander C.'s alleged history of substance abuse and criminal history.

10

*supra,* at p. 1488.) While mootness for this reason should be evaluated on a case-by-case basis, mother has not identified any relief we could grant her as to K.C. now that K.C. has reached the age of majority. (See *In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1316). Mother contends we should nonetheless review the orders as to K.C. because they might affect her in the future if we reverse the orders involving the other three children. Since we affirm, mother's argument fails. Mother's appeal of the orders involving K.C. is moot and must be dismissed.

> ## *Substantial Evidence Supported Jurisdiction Over the Three Younger Children*

The court may exercise jurisdiction over a child if it finds "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1).) We review the jurisdiction order for substantial evidence. (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 438.) We find substantial evidence supported the court's exercise of jurisdiction here.

Starting with mother's "[s]trange voicemail" claiming she was being harassed and spied on in her apartment, mother displayed significant mental health issues, including paranoia and erratic behavior. She refused to allow the deputy into her home for a welfare check, saying she was afraid to leave the apartment because the neighbors were out to get her. While mother was not placed on a section 5150 hold, the deputy thought she appeared "paranoid." Mother was also threatening and

11

belligerent toward the social worker who visited, refusing her entry into the home.

There were reports mother was rude and belligerent toward staff in her apartment building. She shouted obscenities and threw things like condoms and food out the window. She vandalized her apartment and refused to allow anyone in to do repairs. Her apartment was dirty and lacked furniture or beds. When she moved out, the apartment was completely destroyed. She left a strange note saying, "God Bless all you evil People. Pooh Bear Peace Out."

J.M.'s father Alexander C. noticed doors being taken off hinges, and when he asked mother about it, she would tell him to mind his own business. When Alexander C. sought out J.M. in the motel room where the family was living, mother was secretive and would not tell him the room number. When he picked J.M. up, mother was aggressive, yelling and telling the children to shut the door. When he later told mother he would enroll J.M. in school, mother became upset, yelled about "messing up her money," and tricked him into returning J.M. He also reported mother was "talking all weird saying that everybody in the apartment building got light [*sic*] turned on in my name and that they have the house wired and tapped."

Mother's mental health issues had an obvious impact on the children. Both the property manager and a neighbor believed mother was not homeschooling the children, even though she claimed to. The neighbor thought that was due to her mental health issues. The manager thought the children seemed traumatized and were trained not to speak to anyone without mother's permission. Both the manager and neighbor noticed

mother would leave for days with her oldest daughter K.C. in charge of the three younger boys.

Mother was irate when she spoke with her section 8 caseworker, causing the three younger children to cry. Worse, the caseworker thought the children seemed accustomed to mother's "bizarre behavior."

The family's apartment had no furniture, and when they moved out, it was destroyed. Perhaps most seriously, when the family left the apartment, they slept in a tent in a park for several nights after leaving their apartment and before moving into the motel room. This created safety issues, and it negatively impacted the children—J.C. said he did not feel safe sleeping in the park.

Mother's mental health problems were corroborated by both K.C. and J.C., who reported mother was bipolar. K.C. said mother saw and heard things and people who did not exist. K.C. told Alexander C. that "something is wrong with her mother and that she is crazy." Mother's mental health issues led to repeatedly kicking K.C. out of the motel room where they were staying. It led to K.C. feeling "stressed out." While J.C. first reported no problems with mother, he later said he did not like mother or want to return to her.

Mother's mental health issues also impacted her participation with DCFS and her reunification with her children. For two months between June 28, 2019 and August 29, 2019, the dependency investigator was unable to connect with mother, and she did not contact or have any visits with the children. The social worker again experienced trouble contacting mother in November 2019 in order to set up a team meeting. When the meeting was finally held, mother reported she had set goals, had

13

received a mental health assessment, and had another mental health appointment scheduled. While certainly commendable, only four days later mother exhibited more paranoid behavior, sending the social worker a text message claiming she was afraid for her life. The social worker concluded mother's "mental health makes it very difficult to service her case. It is imperative that [mother] begin mental health services and remain consistent with treatment."

While mother contends she provided "appropriate care" for her children, this record of her erratic behavior and its direct impact on the children amply supported the juvenile court's finding the children were at serious risk of harm due to her mental health issues. Mother notes none of the three younger children reported problems with her and they all appeared healthy. Nonetheless, the juvenile court did not have to wait until the children were harmed before exercising jurisdiction. (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1226 [DCFS need not precisely predict what harm will come to children due to mother's mental illness].) In any case, we cannot reverse the jurisdiction order simply because substantial evidence might have supported a contrary finding. (*Id.* at p. 1225.)

Mother contends she was not formally diagnosed with a mental illness, so the record showed only "speculation" that she suffered from mental health issues. Nothing in section 300, subdivision (b) requires a formal diagnosis of a mental illness before the juvenile court could exercise jurisdiction due to mother's mental health issues. The purpose of the dependency statutes is protecting children who are being abused or neglected and to ensure the safety, protection, and well-being of children who are at risk of harm. (§ 300.2.) As is the case here, so long as

a parent's mental health issues place the children at a substantial risk of harm, section 300, subdivision (b) is satisfied and no formal diagnosis is required. (See *In re Khalid H.* (1992) 6 Cal.App.4th 733, 737 [rejecting fixed definition of mental illness in § 300, subd. (b) because goal of provision is "to interfere with parental rights in order to protect children, assist the parents in eliminating the risk to their children through a reunification plan, and subsequently reunite the family"].)

Mother is correct the existence of her mental illness *alone* cannot support jurisdiction. (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 563.) There must be evidence her illness created a "substantial risk of *some* serious physical harm or illness." (*In re Travis C., supra,* 13 Cal.App.5th at p. 1227.) The evidence discussed above demonstrated her mental illness impacted the children. The juvenile court reasonably concluded the children were at significant risk of future harm due to mother's mental health issues.

<u>*Substantial Evidence Supported Removal*</u>

Mother challenges the disposition order removing the children from her custody. Removal is proper if the juvenile court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).)

We review the disposition order for substantial evidence, keeping in mind the juvenile court had to find clear and convincing evidence supporting removal. (*In re V.L.* (2020)

15

54 Cal.App.5th 147, 154–155.) We must decide " 'whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' " (*Id.* at p. 155, citing *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.)

The evidence amply supported removal for many of the same reasons already discussed. The record showed mother's erratic behavior led to her children living in an apartment without furniture or beds, and eventually living in a tent in a park and a motel room. Her behavior prevented her from effectively accepting assistance and caused her to repeatedly kick her oldest child out of the home. Mother resisted contact from a deputy and social workers and resisted efforts to help her once the court detained the children. The children experienced mother's angry and erratic behavior. Although mother has made laudable efforts to start addressing her mental health issues, she spent two months out of contact with both the social worker and her children. Then, just before the disposition hearing she told the social worker someone left a notice on her door and she feared someone would kill her. There is little indication in the record her behavior has changed in any meaningful way to ensure the children would be safe in her custody.

### *The Case Plan Was Not an Abuse of Discretion*

As noted, Mother's case plan included five random drug tests and then tests on suspicion of use; parenting classes; mental health counseling, including a psychological assessment; and individual counseling with a licensed therapist with mother to adhere to the recommendations of the treating doctor. Mother contends there is no "nexus" between her case plan and the facts that gave rise to jurisdiction and removal. (See § 362, subd. (d)

16

["The juvenile court may direct any reasonable orders to the parents or guardians of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out this section . . . . The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300."]; see *In re Briana V.* (2015) 236 Cal.App.4th 297, 311.)

DCFS contends mother forfeited her argument by failing to adequately challenge her case plan in the juvenile court. We need not address this issue because mother forfeited her argument for a different reason—she inadequately supported it in her opening brief on appeal. (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699–700 ["When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary."].) The entirety of mother's legal analysis of this issue is this single sentence: "No nexus can be found here, as mother performed her role and duties as a parent in an exemplary way; accordingly[,] the dispositional orders must be reversed." We review the imposition of a case plan for abuse of discretion. (*In re Briana V., supra,* 236 Cal.App.4th at p. 311.) Mother's conclusory argument does not demonstrate an abuse of discretion.

Setting forfeiture aside, the case plan was proper. Mother's challenge apparently rests on her arguments that the evidence did not support either jurisdiction or removal, which we have rejected. The components of the case plan directing her to take parenting classes and undergo counseling were unquestionably

17

aimed at ameliorating the risks created by mother's mental health problems giving rise to jurisdiction.

The order to take five random drug tests and then test on suspicion of use was also reasonably linked to mother's mental health issues and the children's safety. While the court dismissed the section 300, subdivision (b) allegation that mother endangered the children by allowing drug users and dealers into the home, "the juvenile court is not limited to the content of the sustained petition when it considers what dispositional orders would be in the best interests of the children. [Citations.] Instead, the court may consider the evidence as a whole." (*In re Briana V., supra,* 236 Cal.App.4th at p. 311.) Mother had a 2009 sustained referral alleging she had smoked marijuana in the presence of J.C. and had drugs in the home. Witnesses reported possible drug users and dealers in the apartment where the family lived. The juvenile court could have justifiably worried that if mother were using drugs, that drug use could have seriously exacerbated her mental health problems and jeopardized the children's care. The court's order was narrowly tailored to detect such a problem, given it was limited to five random tests and then testing upon a suspicion mother was using drugs. The court did not abuse its discretion.

## DISPOSITION

Mother's appeal of the jurisdiction and disposition orders involving K.C. is dismissed.  The jurisdiction and disposition orders involving N.C., J.C., and J.M. are affirmed.


BIGELOW, P. J.

We Concur:


GRIMES, J.


STRATTON, J.